### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF SOUTH CAROLINA
### GREENWOOD DIVISION

| | | |
|---|---|---|
| FLEXIBLE TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| vs. | ) | |
| | ) | |
| SHARKNINJA OPERATING, LLC, | ) | **COMPLAINT** |
| SHARKNINJA MANAGEMENT | ) | |
| COMPANY, and SHARKNINJA SALES | ) | **(JURY TRIAL DEMANDED)** |
| COMPANY, | ) | |
| Defendants. | | |

### <u>INTRODUCTION</u>

In the early 2000s, Plaintiff Flexible Technologies, Inc. ("FTI") began developing a first-of-its-kind current-carrying self-retracting hose. On January 2, 2007, the United States Patent Office awarded FTI a patent for its innovative hose technology. Over the years, FTI also developed know-how and other confidential and proprietary information relating to its patented hosing technology. This action concerns the theft of this intellectual property by the Defendants SharkNinja Operating, LLC ("SharkNinja Operating"), SharkNinja Management Company ("SharkNinja Management"), and SharkNinja Sales Company ("SharkNinja Sales") (together and individually, hereinafter, "Shark").

In 2012, Shark (then operating under the corporate name "Euro-Pro") approached South Carolina-based FTI to supply this hose for a new vacuum cleaner line, stating it wished to bring manufacturing jobs back to the U.S. With an understanding of confidence that was confirmed in writing, Shark sought out FTI's intellectual property, including FTI's confidential and trade secret know-how. During a roughly two year period in 2012-2013, FTI disclosed its methods,

techniques, know-how and other confidential information and trade secrets to Shark in a series of meetings and other communications.  Shark then cut FTI out of its plans, took FTI's trade secrets, off-shored production of the subject hose, and launched its Shark Rotator Powered LiftAway™ vacuum cleaner.  The Shark Rotator Powered LiftAway™ is a breakthrough product in today's floor care marketplace.  Shark's own ads state "It's the complete transformation of the upright vacuum! …. The secret behind the rotator is its ability to drive power to power the brush roll when you go into Lift-Away mode."  The current carrying self-retracting hose in this product is based squarely on FTI's intellectual property and is what makes this product "tick."  Shark has never compensated FTI for using its patented invention or trade secrets, and thus FTI now seeks compensatory and exemplary damages, injunctive relief, and its fees and costs.

For its Complaint against Defendants, FTI demands a jury trial and alleges as follows:

## PARTIES

1.      Plaintiff FTI is a corporation duly organized and existing under the laws of Delaware, having its principal place of business at 528 Carwellyn Road, Abbeville, South Carolina 29620.

2.      On information and belief, Defendant SharkNinja Operating is a company duly organized and existing under the laws of Delaware, having its principal place of business at 180 Wells Avenue, Newton, MA 02459.

3.      On information and belief, Defendant SharkNinja Management is a company duly organized and existing under the laws of Delaware, having its principal place of business at 180 Wells Avenue, Newton, MA 02459.

4.      On information and belief, Defendant SharkNinja Sales is a company duly organized and existing under the laws of Delaware, having its principal place of business at 180

Wells Avenue, Newton, MA 02459.  (FTI and Shark are hereinafter referred to collectively as the "Parties.")

5.      On information and belief, all Defendants formerly operated, including during times relevant to this Complaint, under the name "Euro-Pro."  On information and belief, at all times relevant herein, Defendants were and are the agents, partners, and joint-venturers of each other and were acting in the course and scope of their authority as such, and each Defendant approved of and ratified the acts and omissions of the other Defendants.

## NATURE OF THE ACTION

6.      This is an action for patent infringement under the Patent Laws of the United States, 35 U.S.C. §§ 101, *et seq.*, for trade secret misappropriation under South Carolina's Trade Secret Act (South Carolina Code § 39-8-10 *et seq.*) and the Defend Trade Secrets Act, 18 U.S.C. §§ 1831 *et seq.*, for a breach of contract, and for other violations of state law, seeking damages, injunctive relief, attorneys' fees, and for such other relief as the Court deems just and proper.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), 18 U.S.C. § 1836(c), and regarding FTI's state law claims, 28 U.S.C. § 1367.

8.      The Court may exercise personal jurisdiction over Defendants by virtue of, on information and belief, their transacting and doing business and committing tortious acts in the State of South Carolina and this District, including acts of patent infringement by selling and offering to sell infringing products by way of Shark's interactive website, http://www.sharkclean.com, (through which residents of South Carolina can purchase infringing products and have them shipped to South Carolina), and by placing their products into the stream of commerce, with the knowledge that such products will be imported, sold, offered for sale, and/or used in the State of South Carolina through retailers in South Carolina including Walmart

and through the home shopping network known as QVC, which on information and belief is broadcast in South Carolina and has a website that allows people in South Carolina to purchase the accused products.

9.      This Court may also exercise personal jurisdiction over Defendants because they have significant contacts within this state that specifically relate to the events and transactions giving rise to the claims asserted by Plaintiff, including engaging South Carolina-based FTI in a custom engineering relationship, visiting FTI's facility in South Carolina, placing orders for samples from South Carolina, contacting and communicating with FTI in South Carolina and entering into an agreement with FTI in South Carolina in which the Defendants expressly consented to personal jurisdiction in South Carolina.

10.     Venue is proper under 28 U.S.C. §§ 1391(b)-(c) and 1400(b) because, on information and belief, acts of patent infringement have been committed in this District, a substantial part of the property at issue in this action is situated in this District, Defendants are subject to personal jurisdiction in this District and agreed to submit to the jurisdiction of courts in South Carolina, and some of the events giving rise to FTI's claims occurred here.  In addition, venue is proper because FTI is headquartered in this District, has offices and substantial employees in this District, and has suffered and is suffering harm in this District.  Furthermore, at least some inventors of the asserted patents are residents of this District.

## FACTUAL BACKGROUND

### FTI Is A Technology Pioneer In The Field Of Current-Carrying Self-Retracting Stretch Hoses

11.     FTI is an industry leader in the design, development and manufacturing of high-end flexible, stretchable, retractable, and current-carrying hoses for a variety of applications in a wide range of industries.  FTI is headquartered in South Carolina, where it maintains its research

4

and development, marketing and sales departments, and a factory that manufactures hundreds of thousands of feet of hoses annually. FTI has been in South Carolina continuously since the 1960s, and its South Carolina facility employees hundreds of South Carolinians. FTI has received numerous awards over the years, including South Carolina Manufacturer of the Year in 2000 and the State Job Creator Award from the South Carolina Employment Security Commission in 2003 for FTI's Abbeville factory.

12.     FTI's hoses are used in numerous industries, including medical, automotive, marine, and consumer products. Its customers include the United States Navy and NASA. FTI owns a wide-spectrum of intellectual property, including patents and trade secrets that protect its hosing designs, material selections, and know-how from those who would otherwise copy and thereby unfairly and unlawfully reap the rewards of FTI's knowledge, experience and investment in innovation.

13.     FTI is the industry leader in the field of self-retracting stretch hoses—hoses that expand when a pulling force is applied to their ends and retract to their original compressed form when that force is released. For at least three decades, FTI has pushed the boundaries of innovation in this field.

14.     In 2007, FTI was awarded United States Patent No. 7,156,127, entitled "Current Carrying Stretch Hose" (the "'127 patent"). A copy of the '127 patent is attached hereto as **Exhibit A**. The inventors on this patent are Roy Herron, Gregory Moulton, Stephen Mountford and Thomas Dove. The '127 patent claims a flexible hose that is in a retracted position when no tensile force is placed on it and is in an extended condition when a tensile force of a pulling nature is placed on a section of it, and it includes a helical member capable of carrying a current of electricity.

5

15.     FTI protects its confidential technical information with numerous physical and digital security measures.  For example, and without limitation, FTI's facilities are protected by perimeter fences and its docks are gated, its exterior doors are locked and people can gain access only with a bar-coded badge or other security clearance, all digital networks and file servers are password protected, employees are subjected to a variety of background checks, and engineers as well as visitors to FTI's manufacturing floor are subjected to contractual requirements which include non-disclosure and confidentiality obligations.

**Shark Contacted FTI, Ostensibly To Purchase**
**FTI's Patented Current-Carrying Self-Retracting Stretch Hose**

16.     In early February 2012, on information and belief, FTI was the only company making a current-carrying self-retracting stretch hose suitable for a commercial-scale vacuum cleaner application.  The kind of hoses at issue in this action were not available to competitors at that time, because they were not yet featured in any mass market products.

17.     During that time, a long-time veteran of the floor care industry who had a relationship with FTI dating back to the 1980's and 1990's initiated contact with FTI.  He stated that he was performing design work on a new vacuum cleaner line on behalf of Shark (which was then doing business as "Euro Pro") and that Shark needed FTI to customize and supply the current-carrying self-retracting stretch hose component that was crucial for this new product line.  This new product line would eventually become the Shark Rotator Powered Lift-Away$^{TM}$ vacuum cleaner product line.  He stated that Shark would have production volumes of several hundreds of thousands of units, and potentially up to a million units, per year.  The Shark Rotator Powered Lift-Away$^{TM}$ vacuum cleaner is, on information and belief, a blockbuster product in today's vacuum cleaner marketplace.

**The Parties Commenced A Multi-Year Collaboration Based On**
**Express And Implied Promises Of Trust And Confidence**

18.     In the Parties' early discussions, FTI explained its leadership in the field of self-retracting stretch hoses and informed Shark of its patented current-carrying self-retracting stretch hose.  Current-carrying self-retracting stretch hoses for commercial-scale floor care appliance applications were only available from FTI – as stated above, on information and belief, no other tubing manufacturer offered such a product at the time, and FTI's hoses were not available to the public or competitors.

19.     FTI agreed to assist Shark with its Rotator Powered Lift-Away$^{TM}$ future product concept and began a development project to custom engineer its current carrying self-retracting stretch hose technology for Shark's eventual purchase.  A multi-year collaboration between the Parties ensued.

20.     In the field of custom engineering, it is necessary, and customary, that custom solutions providers like FTI and their customers share and maintain technical information in confidence, and that the recipient of such information not use it without the permission of the other party.  FTI had confidence that Shark that would not violate FTI's trust.

21.     In this relationship, FTI supplied its know-how and engaged in custom prototyping for a hose containing and embodying FTI's proprietary technology that would work for Shark's Rotator Powered Lift-Away$^{TM}$ vacuum concept.  FTI, with expenditure of great effort, prototyped sample current carrying self-retracting stretch hoses for Shark, continually optimizing retractability, comfort, aesthetics, safety, durability, and other important features.  During their collaboration, the Parties met numerous times including on the premises of FTI in South Carolina.

22.     By virtue of the Parties' mutual understanding and their conduct, Shark had an implicit understanding, duty and agreement with FTI that all information, know-how, and technical guidance provided by FTI to Shark was to be maintained in confidence, and not be used without permission for any purpose other than doing business with FTI.  Shark knew and had reason to know that it was required to maintain in confidence the information provided by FTI, and that FTI was inferring reasonably that Shark consented to and would do so.

23.     The Parties also had an express understanding of confidentiality; FTI furnished Shark numerous detailed technical drawings of its proprietary current carrying self-retracting stretch hose, and other technical information not covered by or related to the FTI Patent, such as material characteristics, texturing, and test protocols.  The drawings were labeled as follows:

> "The information disclosed herein was originated by and is the property of Flexible Technologies, a division of Smiths Industries, Inc. and except for rights expressly granted to the United States Government, Flexible Technologies reserves all patent, proprietary, design, use, sale manufacturing, and reproduction rights thereto."

Shark solicited and accepted these drawings.  Additionally, pursuant to their relationship of trust, the Parties' engineers and sales executives exchanged dozens of emails containing non-Patented technical information, testing protocols and pricing details.  In these emails FTI repeatedly noted that the information it provided was proprietary.

24.     Further, a senior Shark employee expressly confirmed the Parties' pre-existing agreement and understanding that all confidential information provided by FTI was to be maintained in confidence when she signed a confidentiality agreement that confirmed Shark's obligation of confidentiality to FTI.  *See* **Exhibit B**.  The confidentiality agreement expressly affirmed Shark's "continuing understanding and agreement" that all information gained by Shark through or as a result of its relationship with FTI on any occasion that was not generally known would be confidential.  Shark agreed not to disclose, transfer, or utilize for any purpose any

confidential information at any time, except as specifically authorized by FTI.  In signing this confidentiality agreement, Shark submitted to South Carolina jurisdiction.  This agreement contains a full integration clause and expressly entitles FTI to an injunction to enforce its rights.

25.    On information and belief, the execution of this confidentiality agreement confirmed a prior and future obligation in Shark to maintain in confidence all confidential information it obtained from FTI and not use any such data other than by doing business with FTI.

26.    In October 2013, pursuant to the confidentiality agreement, the Shark employee visited FTI's factory in South Carolina as part of a site audit on behalf of Shark, where she was permitted to review FTI's proprietary manufacturing processes and gained technical information about the production and manufacturing of the subject current-carrying self-retracting stretch hose.

**Shark Stole FTI's Intellectual Property Related To Self-Retracting Current-Carrying Stretch Hose**

27.    By early 2014, months had passed, communications from Shark had tailed off, and Shark had not placed any large scale purchase orders from FTI in connection with its vacuum lines.  Nor did Shark enter into any license agreement or other arrangement to obtain lawful authority to use FTI's patented and proprietary trade secret technology.

28.    Shark nonetheless began to sell the Shark Rotator Powered Lift-Away[TM] vacuum cleaner product, which on information and belief was based on the hosing design that FTI's team had developed for Shark as part of their collaboration.  On information and belief, Shark utilized and disclosed FTI's proprietary and patented technology in making, having made, designing, manufacturing, testing and/or purchasing from a third party or third parties the current-carrying self-retracting stretch hose that is found in Shark's products.

29.     On information and belief, Shark now imports stretch hoses from China from a manufacturing company called Jinwha ChunGuang Rubber and PlasticHose Co. LTD ("ChunGuang").  ChunGuang now produces a self-retracting current-carrying stretch hose that appears essentially indistinguishable from the designs that FTI shared with Shark.

**The Shark Rotator Powered Lift-Away<sup>TM</sup> Became A Hit Product<br>Because Of FTI's Proprietary Hosing Technology**

30.     Internet advertising for the Shark Rotator Powered Lift-Away<sup>TM</sup> product line highlights the conductive hosing as the key component of the new product that differentiates it from the competition.



31.     Shark states: "It's the complete transformation of the upright vacuum! …. The secret behind the rotator is its ability to drive power to power the brush roll when you go into Lift-Away mode.  Power travels through the hose and down the pole and right to the power head.  Now you can reach the tightest spaces in your home, all while the cleaning head is still

powered." The above video snapshot highlights the maneuverability of the current carrying self-retracting stretch hose with power going to the head, key features of the FTI intellectual property.

32.    Another video announces, the Shark Rotator Powered Lift-Away™ vacuum is "the most versatile and most powerful vacuum Shark has ever created. … I've got the power through the hose and through the pole! … This is the world's first Powered Lift-Away™."

33.    Shark is selling the hose as part of complete Rotator Powered Lift-Away™ vacuum cleaners on television, through retail establishments, and over the Internet for prices ranging from approximately $200 to $250, and sells the hose alone for prices ranging from $69.95 to $83.95 directly over the Internet.

## COUNT I – INFRINGEMENT OF U.S. PATENT NO. 7,156,127

34.    Plaintiff incorporates and realleges paragraphs 1-33 above as if fully set forth herein.

35.    U.S. Patent No. 7,156,127 (the "'127 patent") entitled "Current Carrying Stretch Hose" was duly and legally issued by the U.S. Patent and Trademark Office to FTI on January 2, 2007. *See* **Exhibit A**.

36.    FTI is the current assignee of the '127 patent.

37.    The '127 patent is valid and enforceable.

38.    Shark has directly infringed, and continues to directly infringe, literally and/or through the doctrine of equivalents, one or more claims of the '127 patent, including but not limited to claim 1, pursuant to 35 U.S.C. § 271(a), by making, using, selling, offering to sell, and/or importing within the United States, without authority, certain vacuums utilizing certain current-carrying self-retracting stretch hoses, including without limitation the Shark Rotator Powered Lift-Away™ series of vacuums, and certain current-carrying self-retracting stretch

hoses, including without limitation replacement hoses for the Shark Rotator Powered Lift-Away<sup>TM</sup> series of vacuums ("the Accused Products"). On information and belief, the Shark Rotator Powered Lift-Away<sup>TM</sup> series of vacuums includes, without limitation, the Shark Rotator Powered Lift-Away Speed<sup>TM</sup>, Shark Rotator Powered Lift-Away<sup>TM</sup>, and Shark Rotator Powered Lift-Away XL Capacity<sup>TM</sup> vacuums, and includes, without limitation, the following model numbers: NV680, NV681, NV682, NV683, NV650, NV651, NV652, NV751, NV752, NV753, NV753C, NB651Q, NV750W, NV755, UV795, NV581, NV583, and NV581Q.

39.    The Accused Products infringe at least claim 1 of the '127 patent because they are or have: (a) a flexible hose for carrying fluids said hose being in a retracted condition when no tensile force is placed on said hose and in an extended condition when a tensile force of a pulling nature is placed on a section of said hose, said hose consisting essentially of: (b) a first end; (c) a second end; (d) a thermoplastic cover consisting essentially of a single layer of thermoplastic material having a thickness of between about 10 mil to 50 about mil wherein said thermoplastic cover further comprises an interior surface and an exterior surface; (e) a single helical member, capable of retaining its shape in said hose adhered to said interior surface of said thermoplastic cover, said helical member being comprised of a material capable of carrying a current of electricity said helical member being capable of extending when a tensile force of a pulling nature is applied and then retracting to roughly the original shape when a force is not applied said helical member having a gauge between 12 and 21; (f) a plurality of peaks and valleys in said thermoplastic cover caused by said helical member, said peaks having a distance between them, said helical member being interconnected by sidewalls that extend at an angle to the peaks and valleys wherein when said hose is in a retracted condition, the valleys generally U-shaped and when a pulling force is applied to a section of said hose, the valleys become wider and the

angle of the sidewalls stay generally the same; (g) the distance from one peak to an adjacent peak in the hose is about 1/4" to 3/4" when there is no pulling force on a section of said hose and the distance from one peak to an adjacent peak is about 1/2" to 2" when a pulling force is placed on a section of said hose; (h) wherein the length of said hose in said extended condition is about two to about six times greater than the length in said retracted position; and (i) a conductor wire, capable of carrying a current of electricity with a gauge in the range of about 10 to about 30 said conductive wire being disposed on at least one side of said helical member said thermoplastic cover having been extruded around said conductive wire.

40.    The Accused Products are or have hoses that are flexible, and can carry dirt, debris, and air, for example.  The hoses are approximately three feet long at rest, and can be pulled to approximately six feet long.  The hoses have two ends; one end may be connected to the body of the vacuum, while the other end may be connected to a floor nozzle.  The hoses have a thermoplastic cover with a thickness of about 24 mil, with an interior and exterior surface.  The hoses have a sprung steel wire adhered to the interior of the hoses that has a gauge of about 18 and, on information and belief, is made of steel and is capable of carrying a current.  *See* **Exhibit C**.  The steel wire is capable of extending when the hoses are pulled, and then retracting back to its original shape.  The hoses also have a pair of wires that have a gauge of about 19 and, on information and belief, are made of copper and carry current.  *See* **Exhibit D**.  The distance from one peak to an adjacent peak in the hose falls within the range of about 1/4" to 3/4" when there is no pulling force on a section of said hose and falls within the range of about 1/2" to 2" when a pulling force is placed on a section of said hose.

41.    On information and belief, Shark knew or should have known about the '127 patent and its infringement of that patent, because they were informed of the patent in an in-

person meeting and repeatedly by way of the drawings described above that stated all patent rights were reserved.  Additionally, the Shark product is manufactured and sold under the patent licenses listed on the Shark website, one of which expressly lists the '127 patent as prior art. Furthermore, at least as of the time Shark was served with this Complaint, Shark has been fully aware of the '127 patent and its infringement of that patent.

42.    Defendants have indirectly infringed and continue to indirectly infringe at least claim 1 of the '127 patent by actively inducing one another and their respective customers to directly infringe by making, selling, importing and/or using the Accused Products.  Defendants engaged or will have engaged in such inducement having knowledge of the '127 patent. Defendants knew or should have known that these actions would induce direct infringement by others and intended that their actions would induce direct infringement by others.  Defendants contributorily infringe the '127 patent by selling, offering to sell or importing current-carrying self-retracting hoses within the United States that constitute a material part of the invention, knowing the same to be adapted for infringement of the '127 patent, and knowing the same are not staple articles of commerce suitable for substantial non-infringing uses.  As a direct and proximate result of Defendants' indirect infringement by inducement and/or contribution of the '127 patent, Plaintiff has been and continues to be damaged.

43.    The infringement has caused and is continuing to cause damage and irreparable injury to FTI.  FTI will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court as a remedy at law alone would be inadequate.

44.    FTI is entitled to injunctive relief and damages in accordance with 35 U.S.C. §§ 271, 281, 283, and 284.

45.     On information and belief, Shark has infringed the '127 patent as alleged above despite having prior knowledge of the '127 patent and its infringement of the patent, and has acted with willful, intentional, and reckless disregard of the objectively high likelihood that its acts constitute infringement of the '127 patent.  On information and belief, the infringement of the '127 patent has been and continues to be willful, entitling FTI to enhanced damages under 35 U.S.C. § 284 and also a finding that this case is exceptional, entitling FTI to an award of its reasonable attorneys' fees under 35 U.S.C. § 285.

### COUNT 2 – TRADE SECRET MISAPPROPRIATION UNDER SOUTH CAROLINA CODE SECTION 39-8-10 *ET SEQ.*

46.     FTI incorporates paragraphs 1 to 45 above.

47.     A custom engineering relationship is typically understood to involve the confidential sharing of information and prototypes for evaluation purposes.  Under that understanding, FTI passed to Shark numerous confidential and proprietary pieces of information owned by FTI that derive independent economic value from not being generally known, under a reasonable expectation of confidentiality.  This information was not readily ascertainable by proper means.

48.     FTI took reasonable efforts under the circumstances to maintain this information in secrecy and had a reasonable expectation of confidentiality.  FTI's reasonable means of maintaining secrecy included physical and digital security measures to protect its confidential information, confirming Shark's consent to an ongoing confidentiality agreement in writing, marking its technical drawings with a notation that the information conveyed was proprietary, including in its emails a statement that the information was confidential, and by disclosing its secret information only to people who needed to know it for evaluation purposes.

49.    Shark confirmed that FTI was operating reasonably under an expectation of confidentiality in a signed writing when a Shark Senior Quality Engineer executed an express confidentiality agreement.  The confidentiality agreement expressly affirmed Shark's "continuing understanding and agreement" that all information gained by Shark through or as a result of its relationship with FTI on any occasion that was not generally known would be confidential.  Shark agreed not to disclose, transfer, or utilize for any purpose any confidential information at any time, except as specifically authorized by FTI.  This agreement contained a full integration clause and expressly entitles FTI to an injunction to enforce its rights.

50.    FTI's proprietary information conveyed to Shark included non-patented features such as both positive information as to the composition of its product, the material texturing of the product, methods of testing and manufacturing to ensure product reliability, and methods to not rely on, know how, and negative information relating to the same, including what kinds of potential modifications to current-carrying hoses would not work.  The information, know how, and methods described above constitute trade secrets as defined in the South Carolina Trade Secrets Act, S.C. Code § 39-8-10 *et seq*.

51.    On information and belief, Shark improperly used and disclosed FTI's trade secrets in the process of obtaining current-carrying self-retracting stretch hoses for ultimate use and sale in its line of vacuum products that embody these trade secrets, including its line of Rotator Powered Lift-Away™ vacuums, and continues to do so.

52.    FTI has been aggrieved by and is continuing to be aggrieved by Shark's ongoing wrongful acquisition, use, and/or disclosure of FTI's trade secrets and has suffered and is suffering damages as a result thereof, including in the form of lost profit damages.  FTI further

requests a reasonable royalty, unjust enrichment damages, and/or other damages to be proved at trial as well as an injunction against further misappropriation.

53.     Because Shark's acts of misappropriation were willful, wanton, and/or in reckless disregard of FTI's rights, FTI is entitled to exemplary damages under this count in an amount up to twice the above requested amounts.

## COUNT 3 – TRADE SECRET MISAPPROPRIATION UNDER DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836

54.     FTI incorporates paragraphs 1 to 53 above.

55.     Federal law provides that an owner of a trade secret that is misappropriated may bring a civil action if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.  The purpose of the DTSA is to "equip companies with the … tools they need to protect their proprietary information …[so that U. S. companies will] continue to lead the world in creating new and innovative products, technologies, and services." H.R. Rep. No. 114-529, at 6 (2016).

56.     FTI's current-carrying self-retracting stretch hoses are used and intended for use in interstate commerce, as are the floor-care products for which they are intended, as are Shark's Powered Lift-Away vacuums, and as are FTI's custom engineering services.

57.     During the course of their dealings, FTI passed under an expectation of confidentiality numerous confidential and proprietary pieces of information owned by FTI that derive independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, to other persons who could obtain economic value from the disclosure or use of the information.

58.     FTI took reasonable measures to keep such information secret, including but not limited to maintaining extensive physical and digital security measures, confirming FTI's

consent to an ongoing confidentiality agreement in writing, marking its technical drawings with a notation that the information conveyed is proprietary and confidential, including in its emails a statement that the information was proprietary, and by disclosing its secret information only to people who need to know it for the purpose of FTI's business under circumstances where FTI has a reasonable expectation of confidentiality.

59.     Shark confirmed that FTI was reasonably operating under an expectation of confidentiality in a signed writing when its agent executed an express confidentiality agreement on its behalf.  The confidentiality agreement expressly affirmed Shark's "continuing understanding and agreement" that all information gained by Shark through or as a result of its relationship with FTI on any occasion that was not generally known would be confidential. Shark agreed not to disclose, transfer, or utilize for any purpose any confidential information at any time, except as specifically authorized by FTI.  This agreement contained a full integration clause and expressly entitles FTI to an injunction to enforce its rights.

60.     FTI's proprietary information conveyed to Shark included non-patented aspects including both positive information as to the composition of its product, the materials and texturing of its products, methods of testing and manufacturing to ensure product reliability and methods to not rely on, know how, and negative information relating to the same, including what kinds of potential modifications to current-carrying hoses would not work.

61.     On information and belief, Shark improperly used and disclosed FTI's trade secrets in the process of obtaining current-carrying self-retracting stretch hoses for ultimate use and sale in its line of vacuum products that embody these trade secrets, including its line of Rotator Powered Lift-Away vacuums, and continues to do so.

62.     FTI has been aggrieved by Shark's wrongful acquisition, use, and/or disclosure of FTI's trade secrets and has suffered damages as a result thereof, including in the form of lost profit damages.  FTI further requests a reasonable royalty, unjust enrichment damages, other damages to be proved at trial as well as an injunction against further misappropriation.

63.     Because Shark's acts of misappropriation were and are willful and/or malicious, FTI is entitled to exemplary damages not to exceed twice the above requested amounts.

## COUNT 4 – BREACH OF AGREEMENT

64.     FTI incorporates paragraphs 1 to 63 above.

65.     FTI and Shark entered into an agreement through their conduct and mutual understanding that FTI would provide confidential information and know-how to Shark, in confidence, for the sole purpose of Shark purchasing current-carrying self-retracting stretch hoses for Shark's vacuums, and that Shark would not use FTI's confidential information without consent.

66.     This contract was supported by good and adequate consideration, namely that should Shark wish to use the information gained through the Parties' relationship, Shark would purchase from FTI hosing components built based in whole or part on that information or provide appropriate payment to compensate FTI for the information it provided.

67.     Shark agreed to this contract through their conduct in accepting information from FTI, requesting information, and through their conduct indicating that FTI was anticipated to provide current carrying stretch hoses for Shark.

68.     Shark executed and confirmed this contract expressly in writing, both retroactively and prospectively, when its agent executed the Confidentiality Agreement as alleged above, which provides *inter alia* that Shark would not without consent disclose, transfer,

or use any non-public information gained on any occasion through or as a result of Shark's relationship with FTI.

69.    Shark further expressed its consent to the agreement by requesting and accepting from FTI writings, to wit, drawings and emails, which stated that the information provided was proprietary.

70.    Shark violated the Parties' agreement by taking, transferring, disclosing and/or using the technical know-how and proprietary information that it obtained through its relationship with FTI to obtain current-carrying self-retracting stretch hoses and using them in its products without buying those components from FTI or paying a license or royalty fee to FTI.

71.    FTI has been damaged in an amount to be proven at trial by Shark's failure to purchase components from FTI and from its refusal to pay for the information provided and used in breach of the Parties' agreement.  Per the Parties' agreement, FTI is entitled to not just monetary damages, but also expressly to injunctive relief.

## COUNT 5 – BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

72.    Plaintiff incorporates and realleges the allegations of paragraphs 1 to 71 above.

73.    Shark, by the conduct alleged above, violated the covenant of good faith and fair dealing, which required that, based on their implicit and explicit agreements to maintain in confidence confidential information provided by FTI, they not use or disclose any confidential information provided by FTI without its consent.

74.    Shark's conduct as alleged above has caused FTI damages in an amount to be proven at trial.

## COUNT 6 - UNJUST ENRICHMENT

75.    Plaintiff incorporates and realleges the allegations of paragraphs 1 to 74 above.

76.     As alleged above, FTI provided Shark valuable custom engineering services, information, insight and know-how in terms of the designs, specifications and compositions of its products, its testing methods, and various methods to address issues in current-carrying self-retracting stretch hoses.  This information was the result of years of endeavor and experience of FTI.

77.     FTI provided this information under a reasonable expectation of confidentiality and expectation of future sales to Shark, a fact known and understood by Shark.

78.     Shark retained the benefit of the information tendered by FTI in that they used it to obtain the components used in Shark's successful line of Rotator Powered Lift-Away$^{TM}$ vacuum products.

79.     Because FTI provided this information under an understanding and mutual agreement that it was provided for the sole purpose of Shark purchasing products from FTI, and was not to be used or disclosed in any other event, it would be inequitable to allow Shark to retain the benefit provided by FTI without paying for it.

80.     Therefore, Shark has been unjustly enriched at the expense of FTI.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Shark on this Complaint as follows:

A.     A judgment that Shark has infringed and continues to infringe, contribute to, and/or induce the infringement of the '127 patent under at least 35 U.S.C. §§ 271(a), (b), and/or (c), and that such infringement was willful;

B.     A judgment that Shark has infringed and misappropriated FTI's trade secrets, breached the Parties' agreement, breached the covenant of good faith and fair dealing and is liable to FTI for its unjust enrichment due to its wrongful conduct.

C.      An award of actual monetary damages, including both lost profits, a reasonable royalty, and unjust enrichment to be obtained from any and all of Shark's assets, sufficient to compensate Plaintiff for Shark's past, ongoing, and/or future patent infringement, its misappropriations, its breaches, and all of the other wrongful and illegal acts alleged above that have, are, will, or may occur, together with prejudgment and post-judgment interest;

D.      Permanent injunctive relief prohibiting Shark and its officers, agents, representatives, assigns, licensees, distributors, employees, customers, related entities, and all those acting in privity or acting in concert with them, from:

   a.      infringement of any of the claims of the '127 patent; and

   b.      soliciting any new business or new customers using any information or materials derived from infringement of these patents;

   c.      infringement of FTI's trade secrets;

   d.      continuing to breach the Parties' agreement.

E.      An order directing Shark to deliver to Plaintiff, for destruction at Plaintiff's option, all products that infringe the '127 patent;

F.      An award of enhanced damages, to be obtained from any and all of Shark's assets, of three times the amount found or assessed for Shark's willful patent infringement, pursuant to 35 U.S.C. § 284, and such enhanced damages as may be allowable by law for the other wrongful and illegal acts alleged above, including but not limited to under South Carolina Code of Laws Section 39-8-40 and the Defend Trade Secrets Act, including prejudgment and post-judgment interest on such damages;

G.     An order awarding Plaintiff its attorneys' fees, to be obtained from any and all of

Shark's assets, pursuant to 35 U.S.C. § 285, 18 U.S.C. § 1836(b)(3)(D), and South

Carolina Code of Laws Section 39-8-80, including prejudgment interest on such

fees;

H.     An award of Plaintiff's costs and expenses of this suit as prevailing parties, to be

obtained from any and all of Shark's assets; and

I.     Any other relief that the Court deems just and proper.

### **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by

jury on all issues so triable.

Dated: January 13, 2017

Respectfully submitted:


s/Christopher B. Schoen
WYCHE, P.A.
Wallace K. Lightsey (D.S.C. Id. No. 1037)
Christopher B. Schoen (D.S.C. Id. No. 11421)
wlightsey@wyche.com
cschoen@wyche.com
44 E. Camperdown Way
Greenville, SC 29601
Telephone:  864-242-8200
Facsimile:  864-235-8900

And

FARELLA BRAUN + MARTEL LLP
Jeffrey M. Fisher (California State Bar No. 155284)
jfisher@fbm.com
Deepak Gupta (California State Bar No. 226991)
dgupta@fbm.com
Morgan Jackson
mjackson@fbm.com (California State Bar No. 250910)
235 Montgomery Street, 17th Floor

San Francisco, CA  94104
Telephone:  (415) 954-4400
Facsimile:  (415) 954-4480
*(pro hac vice applications to be filed)*

Attorneys for FLEXIBLE TECHNOLOGIES, INC.